# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR BENITEZ, | CV F   06-0142 OWW SMS HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| | [Doc. 1] |
| SCOTT P. RAWERS, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in custody of the California Department of Corrections and Rehabilitation (CDCR), following his conviction in the Superior Court of Fresno County for first degree murder in violation of California Penal Code section 187, and assault with the intent to commit murder in violation of California Penal Code section 217. (Exhibit 1, Abstract of Answer, attached to Answer.)

In the instant petition, Petitioner does not challenge the propriety of his conviction; rather, he challenges Governor Davis' 2003 reversal of the Board of Prison Hearings' (BPH) 2002 decision finding him suitable for parole.

On September 30, 2003, Petitioner filed a petition for writ of habeas corpus in the Superior Court of Fresno County. (Exhibit 6, attached to Answer.)  The petition was denied on October 8, 2003.  (Id.)

On January 14, 2004, Petitioner filed a petition for writ of habeas corpus in the California

1  Court of Appeal, Fifth Appellate District.  (Exhibit 7.)  The petition was denied on June 17,
2  2004.  (Id.)

3       On August 11, 2004, Petitioner filed a petition for writ of habeas corpus in the California
4  Supreme Court.  (Exhibit 8.)  The petition was denied on July 20, 2005.  (Id.)

5       Petitioner filed the instant petition for writ of habeas corpus on February 9, 2006.  (Court
6  Doc. 1.)

7       Respondent filed an answer to the petition on February 5, 2007, and Petitioner filed a
8  traverse on May 2, 2007.  (Court Docs. 18, 23.)

9                            STATEMENT OF FACTS[1]

10       Petitioner asked his cousin Valentine Sanchez if he could have a ride to the town of
11  Sanger.  Mr. Sanchez agreed to give his cousin a ride to Sanger and he, Ramon Alonzo,
12  [Petitioner], and [Petitioner's] unidentified associate then entered Mr. Sanchez' car.  Sanchez
13  drove, while Sanchez' roommate, Ramon Alonzo, sat in the passenger seat, and Petitioner sat
14  behind Alonzo.  As they drove, Petitioner directed Sanchez to drive down a dirt road and pull
15  over.  Without saying anything, Petitioner then placed a gun on the back of Sanchez's head and
16  shot him, killing him instantly.  Petitioner also attempted to shoot Alonzo, however, the gun
17  misfired and he managed to get away.  Petitioner evaded arrest for five years.  Petitioner claimed
18  that the murder occurred because of his belief that Sanchez had killed his brother in Mexico in
19  1969.

20                               DISCUSSION

21  I.    Standard of Review

22       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act
23  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its
24  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries
25  v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th
26  Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,

---

[1] The statement of facts are taken from the Probation Officer's Report, attached as Exhibit 3, to Answer.

2

521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

II.     Review of Claims

A parole release determination is not subject to all of the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 12 (1979)

(explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, an inmate is entitled to the following procedural protections: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; and 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole." Id.

As to these procedural protections, as Respondent submits, Petitioner was provided all that is required. Petitioner was provided with advance notice of the hearing, an opportunity to submit materials for the Board's consideration, an opportunity to be heard during the hearing, representation by his attorney, and a written decision explaining the reasons that parole was denied.

"In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court held that 'revocation of *good time* does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by *some evidence* in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.2006) (italics added). The Ninth Circuit has held that this same standard also extends to parole determinations. Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir.2008), *citing* Irons v. Carey, 505 F.3d 846, 851 (9th Cir.2007), *quoting* Hill, 472 U.S. at 457 ("We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'"). In assessing "whether a state parole board's suitability determination was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Hayward, 512 F.3d at 542, *quoting* Irons, 505 F.3d at 851. Here, the Court must look to California law and review the

record. In reviewing the record and determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Sass, 461 F.3d at 1128.

California law provides that after an inmate has served the minimum term of confinement required by statute, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for" the prisoner. Cal. Penal Code § 3041(b). "[I]f in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable and denied parole. Cal. Code Regs. tit. 15, § 2402(a). The Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors it has set forth in the California Code of Regulations.

To determine whether 'some evidence' supports the state court decision, the test is not whether some evidence supports the reasons cited for denying parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety." Hayward, 512 F.3d at 543, *quoting* In re Lee, 143 Cal.App.4th 1400, 1408 (Cal.Ct.App.2006).

Article 5, section 8(b) of the California Constitution, allows the Governor to review the decision of the BPH and enables him to affirm, modify, or reverse the decision on the basis of the same factors that the BPH is required to consider. See Cal. Const. art. 5, § 8(b); In re Rosenkrantz, 59 P.3d 174, 210 (Cal. 2002). Accordingly, the Governor's decision to reverse a parole grant is reviewed under the same due process principles utilized to review the BPH's denial of parole.

As Respondent submits, in this case, the California Supreme Court issued a reasoned decision because it cited In re Dannenberg, 34 Cal.4th 1041 (2005) and In re Rosenkrantz, 29 Cal.4th 616 (2002), in denying Petitioner's petition. See Exhibit 8. Dannenberg and Rosenkrantz pronounced the "some evidence" standard of review as applicable to findings of suitability of parole. See In re Rosenkrantz, 29 Cal.4th at 658 (which has cited and adopted the Superintendent v. Hill "some evidence" standard as the proper standard for judicial review of

evidentiary sufficient for parole denial cases); In re Dannenberg, 34 Cal.4th at 1084 (same).

At Petitioner's eighth 2002 parole hearing, after considering all the relevant factors, the BPH found that Petitioner did not pose an unreasonable risk of danger to society or a threat to public safety if released from prison stating, in pertinent part:

> The prisoner has no juvenile record, no assaulting others. He has a stable social history, as exhibited by reasonably stable relationships with others. While in prison, he has enhanced his ability to function within the law upon release, through participation in educational programs, self-help and/or therapy programs, vocational programs, [and] institutional job assignments. He committed the crime as result of significant stress in his life, and that he believed that the inmate had killed his brother, and in fact, was going to be going [sic] - - The inmate, I mean believed, going back to Mexico to kill another family member. He lacks any criminal history or violent crime. And in fact, lacks any criminal history of any kind. Because of maturation, growth, a greater understanding, and his age would reduce the probability of recidivism. He has realistic parole plans, which include a job offer and family support. He maintained close family ties while in prison via letters and/or visits. He has maintained positive institutional behavior, which indicates again, improving self-control. He has not had a 115 since 1989. He does show signs of remorse. He's indicated that he understands the nature and magnitude of the offense and accepts responsibility for the criminal behavior and has a desire to change for good citizenship. We also note for the record that there are no responses to the 3042 notices, and there are no agencies or others that are opposed to the finding of suitability. The psychological report, the most recent one on file dated July 13th, 2001, is favorable. That is authored by Doctor Daniels. States that significant risk factors are much less than average if he's released to the community. He has matured constructively while institutionalized. In a less controlled setting, such as a return to the community, that he's likely to hold present gains and continue self-improvement. These are - - And he goes on to state that there appears to be a very low risk of violence to the community if he is released from prison. We also have a psychological report dated 2/23/2000, authored by R. Sheldon, that states that if the inmate were released, he should not present a problem to society. He has been psychologically cleared for all of 1990, and in fact, (indiscernible) psych reports going back into the '80's. . . .

(Exhibit 4, at 46-48.)

In reversing the grant of parole, Governor Davis found that the circumstances of the offense were "especially heinous" and exhibited an "extreme indifference to the value of human life and disregard for human suffering." (Exhibit 2.) Governor Davis noted that despite having several clear opportunities to retreat, Petitioner failed to do so. The Governor disagreed with the BPH's finding that Petitioner had accepted responsibility for the offense. The Governor found that the fact that Petitioner fled after the crime and avoided capture for five years demonstrated a lack of remorse. In addition, the Governor pointed out that Petitioner as "recently as 1998, denied pointing the gun at Mr. Alonzo and claimed that Mr. Alonzo attacked him. By continuing

to justify his actions, Mr. Benitez fails to take full responsibility for this cold-blooded murder." (Id.)

The Governor also disagreed with the BPH's finding that Petitioner committed the crimes while under "significant stress." The Governor noted that Mr. Alonzo did not substantiate Petitioner's comment that Mr. Sanchez made threatening comments toward another relative. The Governor also noted that over six years had passed since the killing of Petitioner's brother, and this lengthy period of time did not support the BPH's finding that Petitioner was suffering from "significant" stress at the time of the crime. (Exhibit 2.)

Finally, the Governor expressed concern regarding Petitioner's parole plans. He noted that Petitioner lacked employment plans in Mexico, and despite previous recommendations from prior hearing panels, he failed to further upgrade his education. (Exhibit 2.)

After a thorough review of the record in this case, the Court finds that the former Governor's findings are either unsupported by the record or based on unchanging circumstances which do not support a present finding of an unreasonable risk of danger to public safety.

Although the Governor found that Petitioner lacked adequate parole plans, the record does not support such a finding. To the contrary, the record consists of Petitioner's concrete plans to return to Mexico (where he will be deported in light of the INS hold) to live with his elderly mother and farm the family's small ranch, which his mother placed in deed to him. (Exhibit 4, at 29.) In addition, Petitioner's niece, Donna Ochoa, offered a place for him to live and a job delivering book products, and a lawyer friend offered Petitioner a job as a legal assistant in Mexico. (Id. at 30-31.) Accordingly, the Governor's finding that Petitioner lacked adequate parole plans is simply unfounded and contrary to the evidence in the record.

With regard to Petitioner's education, although it is true that after Petitioner received his GED in 1986, he failed to upgrade any further educationally, it is unclear why such lack of education is relevant to the determination of whether he presently poses an unreasonable danger to public safety if released. Stated otherwise, it is undisputed that Petitioner made significant advancement vocationally and it is unclear why or how further education would benefit Petitioner, or more importantly how this supports a finding that Petitioner *continues* to be an

8

1 unreasonable risk of danger to the public.

2       Accordingly, this Court is left to review whether the immutable circumstances of
3 Petitioner's commitment offense provide "some evidence" to support Governor Davis's reversal
4 of a grant of parole. "A prisoner's commitment offense may constitute a circumstance tending to
5 show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of
6 parole may be predicated on a prisoner's commitment offense only where the [Governor] can
7 'point to factors beyond the minimum elements of the crime for which the inmate was
8 committed' that demonstrate the inmate will, at the time of the suitability hearing, present a
9 danger to society if released." Irons, 505 F.3d at 852 (citing Dannenberg, 34 Cal.4th at 1071.)

10       However, in Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir.2003), the Ninth Circuit
11 stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the
12 offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by
13 the prison system and could result in a due process violation." Although a denial of parole
14 initially can be justified by relying on the gravity of the offense, over time, "should [the prisoner]
15 continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole
16 date simply because of the nature of [his] offense and prior conduct would raise serious questions
17 involving his liberty interest in parole." Irons v. Carey, ___ F.3d ___, 2007 WL 2027359 *5 (9th
18 Cir. 2007), *citing* Biggs, 334 F.3d at 916. Nevertheless, in both Irons and Biggs, the Ninth Circuit
19 upheld the denials of parole based solely on the commitment offense. This was because in each
20 of these cases the prisoner had not yet served the minimum term of his sentence. The Ninth
21 Circuit recently reiterated this point in Hayward v. Marshall.

22       The circumstances in favor of granting a parole date in this case are akin to the
23 circumstances present in Hayward. There, Hayward, along with other members of a motorcycle
24 gang, confronted a man at a bar "who, according to conflicting accounts, had either slapped or
25 battered and attempted to rape Hayward's girlfriend (who would later become Hayward's wife).
26 The confrontation turned physical and ended after Hayward stabbed the man twelve times, killing
27 him. In 1980, a California jury convicted Hayward of second degree murder, and the court
28 sentenced him to state prison for a term of fifteen years to life." Hayward, 512 F.3d at 538.

Hayward was denied parole by the Governor on the eleventh hearing. At that time he had served twenty-seven years in prison on a sentence of fifteen years-to-life, he was sixty-four years old, and the Board had twice recommended that Hayward receive a parole date. However, former Governor Davis reversed the Board's second grant of parole based on seven factors, four of which were not supported by the record and three of which were based on the immutable factors of the commitment offense. The Ninth Circuit found that in light of Hayward's "rehabilitation by education and conduct while imprisoned and the Board's successive favorable view of his application for release, Hayward's commitment offense, which occurred twenty-five years ago, cannot demonstrate that Hayward's release will pose an imminent danger to public safety." Hayward, 512 F.3d at 546.

Likewise, here, Petitioner was 19 years of age at the time (46 years at the time of the 2002 hearing) and he has served far above the minimum number of years required by his five years to life sentence. At Petitioner's eighth 2002 hearing, he had been incarcerated for over 20 years, on a 5 years to life sentence for first degree murder. Petitioner became eligible for parole in 1986, and was previously granted parole in 1986 and 1992. (Exhibit 4, at 42.) Petitioner has no prior criminal history and has been disciplinary free for approximately thirteen years, having suffered only two rules violation reports during his entire twenty plus years of incarceration, the last in 1989. Petitioner committed the crime at a young age and at a time in his life when he was experiencing stress steaming from the killing of his brother by the victim in Mexico six years prior. Based on statements made by the victim on the day of the offense, Petitioner believed that he was going to go back to Mexico to kill another family member. (Id. at 9-10.) The unusual circumstances of this offense make it unlikely to recur in the future, particularly given Petitioner's current maturation and rehabilitation during his incarceration.

Petitioner obtained his G.E.D. in 1986 and has developed strong English skills. (Exhibit 4, at 26.) The most recent psychological report, dated July 13, 2001, opined that Petitioner posed a very low risk of violence to the community if released. Specifically, the BPH noted that Dr. Daniels report stated that "based on the lack of violence prior to the offense and the lack of violence since the offense while incarcerated, as well as a personality growth and increased

maturity, motivation, and self-control, there appears to be a very low risk of violence in the community, if Mr. Benitez is released." (Id. at 27-28.) In addition, the BPH noted that prior psychological reports cleared Petitioner as early as 1990. (Id. at 48.) Petitioner has admitted guilt and has expressed remorse for his actions.[2] Petitioner has consistently participated in Alcoholics Anonymous (AA), completed the Men Against Violence program, and has developed strong vocational skills having participated in several vocational trainings, including mill and cabinet and auto mechanic courses. (Id. at 22, 28.) Petitioner has received above average work reports, including a letter from a supervisor stating that he not only displayed exceptional work, but also served in a leadership role to the other inmates. (Id. at 24.)

Upon his release, Petitioner plans to return to Mexico (where he will be deported in light of the INS hold) to live with his elderly mother and farm the family's small ranch. (Exhibit 4, at 29.) In addition, Petitioner's niece, Donna Ochoa, offered a place for him to live and a job delivering book products, and a lawyer friend offered Petitioner a job as a legal assistant in Mexico. (Id. at 30-31.)

The Governor's reliance on the stale and static circumstances of the commitment offense resulted in a due process violation in this instance. First, the Governor found that the murder offense was a "cold, callous and dispassionate crime." However, the Governor reliance on such stale and static factors, which occurred in 1975-27 years prior to the 2002 hearing-simply cannot justify the denial of parole, as Petitioner has expressed genuine and sincere remorse, and there is substantial evidence that he is rehabilitated.

Second, former Governor Davis disagreed with the BPH's finding that Petitioner had expressed remorse finding that he fled the country and avoided capture for five years and has consistently attempted to minimize his culpability for both crimes. Although it is true that

---

[2] At the 2002 hearing, in making a statement to the Board, Petitioner stated, in part:

> Well mainly I want to say that I'm very sorry about what I did and I take full responsibility for what I did. I'm not trying to make any excuses or blame anybody. I know that I was young when I committed the crime. I was 19 years old and there was a lot of stuff going through my head and a lot of pressure. Like I said, I take full responsibility. I'm very sorry about what happened and for what I did.

(Exhibit 4, at 44.)

11

Petitioner initially fled the country and avoided capture for five years, again this stale and static factor cannot continue, now well over twenty years later and in the face of Petitioner's substantial rehabilitation, to justify the denial of parole. Governor Davis cited the fact that Petitioner denied pointing the gun at Mr. Alonzo and claimed that Alonzo initiated the attack, to demonstrate that Petitioner continues to justify his actions. However, California Penal Code section 5011 states that, "[t]he Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate committed." Cal. Pen. Code § 5011. As the Board should not require such an admission of guilt, the Governor should likewise not require an admission of guilt before accepting a Board's decision to set a parole date. See e.g. Hayward, 512 F.3d at 542 ("Under California law, the Governor, in considering whether to reverse a grant of parole by the Board, must consider the same factors the Board is required to consider."); see also In re Dannenberg, 34 Cal.4th at 1098-1099. Moreover, Petitioner has undisputably accepted responsibility for his life offense of first degree murder.

Third, the Governor disagreed with the BPH's finding that Petitioner was experiencing "significant stress" at the time of the commission of the crimes. Former Governor Davis cites the fact that Mr. Alonzo's statements to police did not mention any comments by the victim regarding his intent to return to Mexico to kill another family member. In addition, he believed that since six years had passed since Petitioner's brother was killed, Petitioner was not "suffering from 'significant' stress so as to minimize the viciousness of this crime." (Exhibit 2, at 3.) The Governor's reliance on the lack of corroborating evidence relating to the victim's statement and belief that Petitioner was not experiencing stress at the time of the offense, even if assumed to be a correct interpretation of the record, are unchanging factors which do not, in light of this record, provide a basis for the Governor's finding that Petitioner currently presents an unreasonable risk to public safety. For the reasons explained above, given Petitioner's exemplary institutional record during his twenty plus years of incarceration, the weight of the circumstances of his commitment offense have diminished to the degree of no predictive value of his current suitability for parole. (Biggs, 334 F.3d at 916-917; Irons, 505 F.3d at 853; Hayward, 512 F.3d at 546.)

In sum, given Petitioner's exemplary record during his incarceration and his extensive rehabilitation, the immutable factors of Petitioner's commitment offense do not provide "some evidence" to support the Governor's finding that Petitioner currently presents an unreasonable risk to public safety, and the Governor's decision violated Petitioner's due process rights. See Hayward, at 547 (holding that because "the Governor's reversal of parole . . . was not supported by any evidence that Hayward's release would threaten public safety . . . the Governor's reversal of his parole thus violated his due process rights").

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be GRANTED;
2. The Governor's 2003 reversal of the BPH's finding of suitability for parole be reversed; and,
3. The parole date set at the 2002 parole hearing be reinstated.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   April 21, 2008**           /s/ Sandra M. Snyder
                                      UNITED STATES MAGISTRATE JUDGE